BRONSTER FUJICHAKU ROBBINS
A Law Corporation
MARGERY S. BRONSTER        4750
ROBERT M. HATCH            7724
1003 Bishop Street, Suite 2300
Honolulu, Hawai'i  96813
Telephone: (808) 524-5644
Facsimile:  (808) 599-1881
E-mail:   mbronster@bfrhawaii.com
          rhatch@bfrhawaii.com


MCCUNE LAW GROUP
McCUNE WRIGHT AREVALO VERCOSKI KUSEL WECK BRANDT APC
RICHARD D. McCUNE *(Pro Hac Vice to be submitted)*
DAVID C. WRIGHT (*Pro Hac Vice to be submitted*)
Dana R. Vogel (*Pro Hac Vice to be submitted*)
Keena Patel (*Pro Hac Vice to be submitted*)
3281 East Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile:  (909) 557-1275
E-mail:  rdm@mccunewright.com
         dcw@mccunewright.com
         drv@mccunewright.com
         kp@mccunewright.com


Attorneys for Plaintiffs
ELISAPETA ALAIMALEATA, KERESEMA ALAIMALEATA, BENJAMIN
ALAIMALEATA, GREGORY BENTON, ANA BENTON, IN-YOUNG FEIST,
A.F., a Minor, by and through his Guardian Ad Litem JOSEPH FEIST, S.F., a
Minor, by and through her Guardian Ad Litem JOSEPH FEIST, FETUAO
TUUPO, and M.T., a Minor, by and through her Guardian Ad Litem ELISAPETA
ALAIMALEATA, individually and on behalf of all others similarly situated

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| ELISAPETA ALAIMALEATA, KERESEMA ALAIMALEATA, BENJAMIN ALAIMALEATA, GREGORY BENTON, ANA BENTON, IN-YOUNG FEIST, A.F., a Minor, by and through his Guardian Ad Litem JOSEPH FEIST, S.F., a Minor, by and through her Guardian Ad Litem JOSEPH FEIST, FETUAO TUUPO, and M.T., a Minor, by and through her Guardian Ad Litem ELISAPETA ALAIMALEATA, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>THE UNITED STATES OF AMERICA and DOES 1 through 10,<br><br>    Defendant. | Case No. 1:23-cv-00164<br><br>**COMPLAINT** |

**<u>TABLE OF CONTENTS</u>**

I       Introduction……………………………………………………………………1

II      Jurisdiction and Venue……………………………………………………3

III     Parties………………………………………………………………………4

        A.      Plaintiffs………………………………………………………………4

                1.      Plaintiffs Elisapeta Alaimaleata, Keresema Alaimaleata,
                        Fetuao Tuupo, Benjamin Alaimaleata, and M.T.
                        ………..…………………………………………………..………4

                2.      Plaintiffs Gregory and Ana Benton………………………6
                3.      Plaintiffs In-Young, A.F., and S.F……………………….…6

        B.      Defendant United States of America…………………………………8

        C.      DOES 1 through 10…………………………………………………8

IV      Factual Background…………………………………………………………9

        A.      The Red Hill Facility…………………………………………………9

        B.      The Navy's Prior Knowledge of the Risks and Its Failure
                to Act…………………………………………………………..……11

        C.      The May 2021 Incident………………………………………...13

        D.      The November 2021 Incident…………………………………………20

        E.      The Government Failed to Alert the Public to the Leak or
                Its Risks…………………………………………………………...23

        F.      The Red Hill Leak Was One Part of an Endemic Culture of
                Negligence at the Facility…………………………………………...25

        G.      The Aftermath of the Red Hill Leak………………………………...28

V       Class Allegations…………………………………………………………...29

VI      Medical Monitoring………………………………………………………...32

VII     Causes of Action…………………………………………………………...34

VIII    Prayer………………………………………………………………………37

## COMPLAINT

Plaintiffs Elisapeta Alaimaleata, Keresema Alaimaleata, Benjamin Alaimaleata, Ana Benton, Gregory Benton, In-Young Feist, A.F., a Minor, by and through his Guardian Ad Litem Joseph Feist, S.F., a Minor, by and through her Guardian Ad Litem Joseph Feist, Fetuao Tuupo, and M.T., a Minor, by and through her Guardian Ad Litem Elisapeta Alaimaleata, individually and on behalf of a class of similarly situated individuals, file this lawsuit against the United States of America, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674.

Plaintiffs filed administrative claims with the Department of the Navy more than six months ago, but the United States has not yet resolved these claims.

## I      INTRODUCTION

1.      The FTCA provides that the United States of America "shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Any private company that released toxic chemicals into the local water supply would be held fully responsible for its actions. The United States must be treated no different.

2.      On May 6, 2021, operators at the Red Hill Bulk Fuel Storage Facility ("Red Hill") improperly executed a fuel transfer procedure, resulting in two pipe

ruptures and the subsequent spill of highly toxic jet fuel and other contaminants on

Oʻahu, one of the islands that make up the State of Hawaiʻi.[1] As a result, a pipeline

joint failed and released over 19,000 gallons of jet fuel and other contaminants

onto the tunnel floor between the existing underground fuel storage tanks.[2]  The

fuel ran down the floor into containment trenches and invaded a fire suppression

system fluid sump.  The sump pushed the fuel further down the tunnel through a

fluid drain pipeline, where it remained until November 20, 2021, when the

passenger cart of a train operated by a Navy employee contacted and ruptured that

pipeline.[3] The rupture resulted in fuel spilling into a pre-existing tunnel system

resting near a primary source for Red Hill's drinking water, which serves over

90,000 military servicemen and women, and their families.[4]

       3.      After an investigation, the Navy concluded that the contamination

resulted from human error and a failure to comply with applicable laws, rules,

regulations, and standards.[5] These laws included both federal law and regulation

---

[1] Department of the Navy, Supplement to the Command Investigation into the 6 May 2021 and 20 November 2021 Incidents at Red Hill Bulk Fuel Storage Facility ("April 2022 Supplemental Report") at 9 (Apr. 15, 2022), available at https://www.epa.gov/system/files/documents/2022-07/FOIA-Release-Red%20Hill-CI-%28June%202022%29.pdf [last visited Mar. 30, 2023].
[2] Environmental Protection Agency, *About Red Hill Fuel Releases*, available at https://www.epa.gov/red-hill/about-red-hill-fuel-releases#2021-05 (last visited Mar. 30, 2023).
[3] April 2022 Supplemental Report at 25.
[4] Id. at 25; see EPA, About Red Hill Fuel Releases.
[5] April 2022 Supplemental Report at 1.

generally governing the storage, maintenance, and discharge of potable water. In other words, like any other polluter that failed to comply with applicable law, the Navy had to take responsibility for its failures. The Navy concluded that the November spill resulted from "human error exacerbated by poor Red Hill support system design and implementation."[6] But, unfortunately, the Navy has not extended its responsibility so far as to recompense Plaintiffs and others for the harm caused by its negligence.

4.     The United States must be held accountable for the harm it has caused. System operators had a duty to act reasonably, and didn't. The Navy had a duty to clean up its mess. It didn't. It had a duty to comply with all applicable, laws, rules, regulations and standards.. But it didn't do that either. The combined breaches of these duties led to an eminently foreseeable result—the release of thousands of gallons of jet fuel and additives including anti-freeze into the public water supply. This Complaint seeks relief for the injuries the United States has caused.

## II      JURISDICTION AND VENUE

5.     This Court has jurisdiction over this claim against the United States for money damages pursuant to 28 U.S.C. § 1346(b) and the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq*.

---

[6] April 2022 Supplemental Report at 2.

6.    Venue is proper in this district under 28 U.S.C. § 1402(b) because the United States is a defendant pursuant to 28 U.S.C. § 1346(b) and the acts and omissions complained of occurred in this District.

### III    PARTIES

**A.    Plaintiffs**

**1.    Plaintiffs Elisapeta Alaimaleata, Keresema Alaimaleata, Fetuao Tuupo, Benjamin Alaimaleata, and M.T.**

7.    Plaintiffs Elisapeta Alaimaleata, Keresema Alaimaleata, Fetuao Tuupo, Benjamin Alaimaleata, and M.T. are residents of Honolulu, Hawaiʻi, who lived in a multi-family property affected by the conditions described herein.

8.    On and about November 27, 2021, Plaintiffs' in-home drinking water was polluted and contaminated with petroleum contaminants resulting from the Navy's negligent and/or reckless actions, inactions, and/or omissions.

9.    Before the Navy gave notice of the contamination crisis, Plaintiffs used the drinking water in various manners—resulting in various health issues. Among other things, Mrs. Alaimaleata experienced lesions on her hands, rashes, and itching; Mr. Alaimaleata, a veteran with prior heart surgery, experienced the scar from that surgery "break" and release pus; and Ms. Tuupo faced these conditions as a seventy-five-year old, recently-diagnosed cancer patient. Both Benjamin Alaimaleata and M.T., a minor, were exposed to this contamination during a period of critical youth development and maturation.

4

10.    By the time Plaintiffs discovered the cause of the environmental crisis—from the media, not the Navy—they attempted to mitigate by obtaining fresh drinking water from other sources. Plaintiffs stopped using their in-home water.

11.    Plaintiffs were never offered any financial assistance, including, but not limited to, reimbursement for rental expenses. Worse, they were not relocated for several weeks. And even after their relocation, they were forced to return home in mid-December 2021 to the same harmful conditions they earlier abandoned. Plaintiffs eventually secured new hotel accommodations, but have not returned to their family home since February 2022.

12.    As a direct and proximate result of Defendant's negligent and/or reckless conduct, Plaintiffs have been deprived in the use and enjoyment of their property. Plaintiffs have never consented to polluting their water supply with hazardous petroleum-related substances.

13.    Plaintiffs sent their amended administrative claims to the United States on March 7, 2022, and they were received on March 9, 2022. Plaintiffs have, individually, suffered property damage and damages related to personal injuries suffered from exposure.

## 2.    Plaintiffs Gregory and Ana Benton

14.    Plaintiffs Gregory and Ana Benton live in the Ewa Beach area and were directly affected by the Red Hill leak. Prior to receiving notice about their contaminated drinking water, Plaintiffs used it for several days while the crisis was unfolding.

15.    As a direct and proximate result of exposure, Plaintiffs sustained, and continue to suffer, various health injuries. Mrs. Benton developed rashes on her abdomen and Mr. Benton, a retired Army veteran, has been diagnosed with cancer and faces additional heightened health concerns.

16.    As a result, Plaintiffs engaged in extensive, and costly, protections to limit their exposure. The release of toxic chemicals has substantially interfered with Plaintiffs' use and enjoyment of their property by contaminating the water supply and increasing dangers to Plaintiffs' health. Plaintiffs have not, and would not, consent to the Navy's actions.

17.    Plaintiffs sent their amended administrative claims to the United States on March 7, 2022, and they were received on March 9, 2022. Plaintiffs have, individually, suffered property damage and damages related to personal injuries suffered from exposure.

## 3.    Plaintiffs In-Young, A.F., and S.F.

18.    Plaintiff In-Young Feist is married to a United States serviceman and

raises two children, S.F. (12) and A.F. (7). The family first noticed gas in the water on November 29, 2021.

19.    After noticing a strong gas smell coming from the water, they began to suffer from various symptoms, including burning eyes, skin irritation, headaches, gastrointestinal sickness, nausea, and abdominal pain.

20.    Prior to receiving notice about the contamination, Plaintiffs used the contaminated drinking water, resulting in stomach cramps, diarrhea, headaches, skin issues (e.g., rashes), loss of appetite, and bloody noses. S.F. experienced problems with her vision.

21.    When Plaintiffs became aware of the impending environmental crisis, they had to obtain fresh drinking water from other sources to satisfy basic necessities, such as bathing. Plaintiffs were eventually forced to relocate because the water was no longer drinkable.

22.    As a direct and proximate result of Defendant's negligent and/or reckless conduct, Plaintiffs have been deprived in the use and enjoyment of their property. Plaintiffs have never consented to the Defendant's pollution of their home or bodies with hazardous petroleum-related substances.

23.    Plaintiffs sent their amended administrative claims to the United States on March 7, 2022, and they were received on March 9, 2022. Plaintiffs have,

individually, suffered property damage and damages related to personal injuries suffered from exposure.

**B.    Defendant United States of America**

24.    The United States of America has waived sovereign immunity under the Federal Tort Claims Act, 28 U.S.C. § 2674.

**C.    DOES 1 through 10**

25.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, the true names and capacities, whether individual, corporate, or otherwise, of DOES 1 through 10, inclusive, were unknown to Plaintiffs at the time of this submission in this matter and, therefore, bring claims against said DOES by fictitious names. Each of the DOES designated herein by fictious names is in some manner legally responsible for the events and happenings being referred to and caused the damages proximately and foreseeably to Plaintiffs as alleged herein.

26.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, all acts and omissions of said DOES, including named DOES 1 through 10, were undertaken by the DOES and their agents, servants, employees, and/or contractors, acting in the course and scope of its or their respective agencies, services, employments, and/or contracts.

27.    Plaintiffs will name DOES 1 through 10 once information and/or material necessary to properly identify each of the DOES becomes available.

# IV    FACTUAL BACKGROUND

## A.    The Red Hill Facility

28.    Joint Base Pearl Harbor-Hickam ("JBPHH") exemplifies the long-standing presence of the United States military on the island of Oʻahu. Incorporating both Navy and Air Force resources, JBPHH has more than 90,000 personnel under its jurisdiction.[7]

29.    Since 1948, the Navy has operated the Red Hill facility at JBPHH to store and maintain its jet fuel reserves in the region. The facility consists of 20 pill-shaped tanks measuring 100 feet in diameter and 250 feet in height—each holding 12.5 million gallons of fuel—and capable of storing up to 250 million gallons of fuel. Each tank connects to pipelines that link to fueling piers at the naval base. The jet fuel Red Hill stores contains multiple toxic compounds, including benzene, toluene, ethylbenzene, xylenes, naphthalene, and methylnaphthalenes. The jet fuel also contains toxic additives like antifreeze (2-(2 methoxyethoxy)-ethanol) which is added to the jet fuel as a fuel system icing inhibitor.

30.    JBPHH sits atop and utilizes two aquifers—the Halawa and Moanalua—that provide tens of millions of gallons of water to military personnel,

---

[7] Military Installations, *Joint Base Pearl Harbor-Hickam, In-Depth Overview*, https://installations.militaryonesource.mil/in-depth-overview/joint-base-pearl-harbor-hickam [last visited Mar. 31, 2023].

their families, and the local community. The Red Hill facility straddles these

aquifers. (*See* Figures 1 & 2.)

31.    The Red Hill facility is close to three sources of water used by JBPHH

and the State of Hawaiʻi's Board of Water Supply ("BWS"). The Red Hill Shaft,

tapping the Waimalu aquifer and utilized by JBPHH, rests within the Red Hill

facility's boundaries. The Halawa Shaft, tapping the Waimalu aquifer and utilized

by BWS, is just more than a mile from the facility. Finally, the Moanalua Well,

drawing from the Moanalua aquifer and utilized by the BWS, is a little over a mile

and half from the facility. (*Id.*)



Figure 1 – Location of the Red Hill Facility

10



Figure 2 – Proximity of Red Hill to Water Sources

**B.    The Navy's Prior Knowledge of the Risks and Its Failure to Act**

32.    The Navy has long been aware of the Red Hill facility's risks, including the potential to release jet fuel and other contaminants into nearby groundwater. Time and again, the Navy has promised to improve the Red Hill facility to prevent such a disaster, but has failed to uphold its promises.

33.    In 2008, the Navy and the State of Hawaiʻi entered into the "Red Hill Bulk Fuel Storage Facility Groundwater Protection Plan" ("GPP"), designed to mitigate the risks of leaks and releases from the Red Hill facility. The GPP recognized the danger the facility posed to sources of potable water because of its location "approximately 100 feet above the basal groundwater table on the

11

boundary of the Waimalu and Moanalua Aquifer Systems . . . ."[8] The GPP warned, "[t]he nature of the fractured basalt beneath the site would make cleanup of a future petroleum release difficult."[9] In light of these risks, the Navy promised to upgrade and improve facility maintenance and increase its ability to monitor and detect groundwater leaks.[10]

34.    It didn't. An internal Navy audit in 2010 noted the Red Hill facility's failure to ensure adequate maintenance of the tanks and monitor leaks and groundwater contamination.[11] As a result, the audit determined that "the environment and groundwater sources in the Pearl Harbor area have not been sufficiently protected."[12]

35.    In 2014, the Navy's negligence came home to roost, as a fuel tank released up to 27,000 gallons of JP-8 jet fuel. Again, the Navy promised to improve its administration of the Red Hill facility, entering into an Administrative

---

[8] Department of the Navy, *Red Hill Bulk Fuel Storage Facility Final Groundwater Protection Plan: Pearl Harbor Hawaii* (Jan. 2008), at 1-2, available at https://health.hawaii.gov/ust/files/2014/08/2008-Final-Groundwater-Protection-Plan.pdf [last visited Dec. 19, 2022].
[9] *Id.*
[10] *Id.* at 1-3.
[11] Naval Audit Service, *Audit Report: Department of the Navy Red Hill and Upper Tank Farm Fuel Storage Facilities (Redacted)* at 9 (Aug. 16, 2010), available at https://www.boardofwatersupply.com/bws/media/redhill/audit-reports/red-hill-ocr-report-naval-audit-2010-08-16.pdf [last visited Mar. 31, 2023.]
[12] *Id.* at 11.

Order of Consent with agencies, including the EPA, and promising to take concrete steps to protect groundwater.

36.     But in 2018, a Navy-commissioned study revealed more than a 27% probability of a release between 1,000 and 30,000 gallons of fuel per year, and a greater than 34% chance of a release of more than 120,000 gallons of fuel within the next 100 years.[13] This warning would soon prove prescient.

## C.     The May 2021 Incident

37.     On May 6, 2021, Red Hill operators improperly executed a fuel transfer procedure, resulting in two piping joint ruptures and a subsequent spill of thousands of gallons of jet fuel and other contaminants. This was bad enough, but they compounded the problem by failing to identify the consequences of their negligence. In the accident's immediate aftermath, for instance, the Deputy Fuels Director investigating the incident determined after taking a visual estimation that approximately 1,000 and 1,500 gallons had been spilled and recovered.[14] Because this visual inspection matched the amount of fuel recovered, the Navy concluded that the spill had been contained. And because all the fuel was accounted for,

---

[13] NAVFAC Pacific, *Quantitative Risk and Vulnerability Assessment Phase 1: Red Hill Bulk Fuel Storage Facility*, NAVSUP FLC Pearl Harbor, HI (PRL), at 12-29, 14-1 (Nov. 12, 2018) ("QRVA Report"), available at https://www.epa.gov/sites/default/files/2019-06/documents/red_hill_risk_assessment_report_redacted-2018-11-12.pdf [last visited Mar. 30, 2023].

[14] April 2022 Supplemental Report at 13.

system operators determined that the spill had been stopped and it was safe to re-enter the area.

38.    But contrary to these initial conclusions, nearly 20,000 gallons had escaped into a fire suppression system retention line by way of sump pumps intended to collect aqueous firefighting foam in the case of fire. Because the system employed four pumps, each with a 1,000-gallon per minute capacity, the transfer would have taken less than five minutes.[15]

39.    Throughout the resulting investigation, the Navy minimized, distinguished, and ignored evidence contradicting the earliest conclusions it reached in the panicked hours after the spill. In the accident's immediate aftermath, the Navy told the public that the spill was "contained," and no fuel had contaminated the environment.[16] This statement was highly misleading. The water supply had only been spared by the fortuitous collection of the escaping fuel into the fire suppression system.

40.    Worse, the Navy did not know any fuel had escaped. Instead, it disclosed that "all released fuel was contained within the tunnel and recovered."[17]

---

[15] *Id.* at 10.
[16] News Release, *U.S. Navy Contains Fuel Release at Red Hill Bulk Fuel Storage Facility* (May 7, 2021), available at https://cnrh.cnic.navy.mil/Portals/79/CNRH/Documents/red_hill/News_Releases/21-03%20US%20Navy%20Contains%20Release%20of%20Fuel%20at%20Red%20Hill.pdf [last visited Mar.. 31, 2023]; April 2022 Supplemental Report at 13.
[17] April 2022 Supplemental Report at 14.

It denied any risk to the environment or the public, repeating that "[n]o fuel was released into the environment."[18] But it reached these conclusions based only on cursory visual observations. This served both the Navy and facility employees, who were motivated to minimize the accident because of their own complicity and Red Hill's already spotty history of environmental contamination.

41.     The Navy settled on a story that fewer than 1,000 gallons of fuel had escaped during a fuel transfer, but that all the missing fuel had been intercepted by an available fuel containment system.[19] The release stated that no fuel had leaked from the fuel tanks and that the fuel release had been detected immediately. Only a few days later, the Navy announced that only 557 gallons had been released.[20]

42.     It was not for another week that a Red Hill engineer discovered a damaged dresser coupling on one tank.[21] This discovery caused the Navy to recalculate the amount of spilled fuel as 1,618 gallons.[22]

---

[18] *Id.*

[19] *See* April 2022 Supplemental Report at 14. The Navy requested an inspection of the fuel suppression system from its contractor, which concluded that the pumps had never activated based on a review of the panel responsible for tracking system activity. Only later was it realized that the panel was not reading the pumps correctly. *Id.* at 14-15.

[20] *Id.* at 16.

[21] *Id.* at 17.

[22] *Id.*

43.     This discovery should have made the Navy particularly wary of its previous assumptions. It further brought into question whether earlier methods of calculation needed to be rethought when it obtained new information.

44.     And as it turns out, the Navy knew—or at least should have known—that the fuel spill was 4,000% bigger than it represented. As early as May 2021, one Navy analyst documented a fuel loss of ***20,139 gallons***.[23] The report stated that "19,983 gallons [were] put into the pipeline and not accounted for inside any tank,"[24] but the Navy ignored this finding.[25]

45.     Instead, it continued to report that 1,618 gallons had spilled and all remaining fuel was accounted for.[26] The discrepancy was even reported to the responsible commanding officer, though he later claimed not to remember the report.[27]

46.     Meanwhile, signs of environmental contamination appeared as early as Summer 2021. In June, petroleum hydrocarbons in the water supply increased

---

[23] Id.

[24] April 2022 Supplemental Report at 17; *see also id.* at 89 ("Additionally, the theory that fuel was 'packed in the pipe' demonstrates a fundamental lack of engineering rigor and a gross misunderstanding of the installed fuel accountability system which uses tank levels, reported transactions, and an assumption that all fuel pipelines are full to report changes in the bulk fuel account.").

[25] *Id.* at 90 ("Most importantly, the NPO Deputy OIC, in spite of having adequate information provided, failed to accurately resolve the most critical and fundamental fact associated with the May spill—the volume of fuel spilled.").

[26] *Id.* at 16-18.

[27] *Id.* at 17.

far above the State's approved Environmental Action Level for potable water.[28]
But ultimately, the Navy overlooked these signs as well.

47.    On June 25, 2021, an internal report reiterated that relatively small
amounts of fuel had been released.[29] The report failed to mention the inventory
ledger indicating the 20,000-gallon fuel loss.[30]

48.    But the missing 20,000 gallons refused to fully disappear. In
September 2021, a Navy employee issued a memorandum summarizing the results
of a third party's root cause analysis of the May accident.[31] The analysis identified
a volume drop of 473 barrels during the accident, equating to ***19,866 gallons***.[32] But
the Navy decided these calculations merited further exploration.[33] As for the
private entity issuing the report, the Navy directed it only to analyze the accident's

---

[28] *Id.* at 18 ("Although known to the NPO Deputy OIC at the time, he did not
provide NAVFAC HI documents indicating the approximately 20,000 gallon loss
of inventory reported in FMD on 6 May, when he requested assistance in
validating the FLC PH calculations of fuel lost.").

[29] April 2022 Supplemental Report at 19 ¶¶ 100–01, 22 ¶¶ 117–18.

[30] *Id.* ("Although known at the time, the NPO Deputy OIC did not include in his
report the fact that the FMD inventory ledger from May 6 indicated a fuel loss of
approximately 20,000 gallons because he did not deem it relevant.").

[31] The "root cause" report referenced here can be found at Department of the Navy,
*Root Cause Analysis of the JP-5 Pipeline Damage* (Sept. 7, 2021), available at
https://cnrh.cnic.navy.mil/Portals/79/CNRH/Documents/red_hill/Reports/RH%20R
oot%20Cause%20Analysis%20Memo%20and%20Report%2007Sept2021-
Final%20Rpt-Redacted.pdf [last visited Mar. 31, 2023].

[32] April 2022 Supplemental Report at 21. This estimate was within 100-300 gallons
of the May 2021 analysis.

[33] *Id.* ("While this information was contained in the root cause analysis, none of the
technical personnel that reviewed the report identified this as an issue worth
exploring.").

cause, not the scope of its effects.[34] Therefore, it did not follow up on its findings either.

49.    In September 2021, the Navy amended its own investigative report to incorporate the results of the root cause analysis, which concluded that the double block and bleed valve in one tank had opened, causing a rapid inflow of fuel and resulting in a key connector's failure.[35] The resulting pressure wave displaced the piping and damaged the dresser couplings.[36] Despite the Navy's rapidly changing theory of causation, however, it still failed to address the discrepancy between the 20,000 gallons of fuel described in the root cause analysis and the 1,500 gallons of fuel it had earlier disclosed.

50.    At this point, various senior leaders reviewed drafts of the Navy's report and "identified various deficiencies or concerns with the draft" and "generally assessed it was not thorough or well done."[37] Even so, no one brought up the 20,000-gallon discrepancy.[38] These concerns were never communicated through the chain of command, and the investigation closed in September 2021.[39]

---

[34] See id.
[35] April 2022 Supplemental Report at 22.
[36] *Id.*
[37] *Id.* at 23.
[38] *See id.* at 88 ("There were <u>many</u> missed opportunities to identify or correct this error before the November spill that are important to understand.").
[39] *See id.* at 23 ("Of note, no one identified the discrepancy of the 20,000 gallons. While there were some discussions . . . on the appropriateness of communicating their issues or concerns about the draft report [], ultimately no one communicated these concerns or issues . . . prior to the investigation being closed out.").

51.    A follow-up report released the next month recommended various

corrective actions, including proper construction of the pipeline system, safety

alarms, and repeatable instructions and rules for system operators.[40] There is no

evidence that any of these changes took place.

52.    On October 26, 2021, the Navy issued yet another press release

informing the public that the investigation had confirmed "operator error" as the

reason for releasing 1,618 gallons of jet fuel.[41] It repeated that the vast majority of

the released fuel was recovered, and detailed new procedures to prevent future

incidents.[42] Public versions of the Navy's report and the third-party "root cause

analysis" were released to the public.[43]

---

[40] Department of the Navy, *Command Investigation into the Fuel Spill at the Red Hill Bulk Fuel Storage Facility on or about 6 May 2021* (Oct. 14, 2021), available at
https://cnrh.cnic.navy.mil/Portals/79/CNRH/Documents/red_hill/Reports/6%20May%2021%20JP5%20Spill%20CI%20-%20Final%20Report-
Redacted.pdf?ver=O5JnT-jVL_jAo56s84k31w%3d%3d [last visited Mar.. 31, 2023.]

[41] Media Advisory, *U.S. Navy Identifies Operator Error as Cause of May 6 Fuel Release at Red Hill* (Oct. 26, 2021), available at
https://cnrh.cnic.navy.mil/Portals/79/CNRH/Documents/red_hill/News_Releases/21-
08%20U.S.%20Navy%20Identifies%20Operator%20Error%20as%20Cause%20of%20May%206%20Fuel%20Release%20at%20Red%20Hill.pdf?ver=r1U1txiPkj1Ay0jZb4dQ1w%3d%3d [last visited Mar.. 31, 2023] ("Oct. 26 Media Advisory");
*see also* April 2022 Supplemental Report at 24.

[42] Oct. 26 Media Advisory ("The Navy recovered all but 38 gallons of fuel and has already implemented new procedures, many within days of the incident."). The Navy's media release also claimed that the "fuel containment system" had "performed as it was designed," had "properly monitored and detected the fuel release," and "collected the majority of the fuel." *Id.*

[43] Department of the Navy, Root Cause Analysis of the JP-5 Pipeline Damage, Sept. 7, 2021.

19

**D.      The November 2021 Incident**

53.     On November 20, 2021, a worker operating a trolley in the lower

access tunnel of the Red Hill facility cracked a clean-out valve for the overhead

pipe where the fuel had been retained.[44] The crack caused the thousands of gallons

of jet fuel spilled in the May 2021 accident to pour onto the concrete tunnel floor

and into the underlying water development tunnel.[45] The mixture then accumulated

in a groundwater sump designed to prevent flooding in the access tunnel.[46] A sump

pump transferred this mixture to the groundwater sump drain holding tank and a

connected sump drain leach tank located outside the tunnel.[47] The jet fuel mixture

made its way into a Hume drain,[48] where the mixture leached into the underlying

basalt bedrock, and from there into the Red Hill water development tunnel.[49]

---

[44] See April 2022 Supplemental Report at 25; see also Department of the Navy, Command Investigation into the Fuel Spill at the Red Hill Bulk Fuel Storage Facility on or about 6 May 2021 at 28-29.

[45] Environmental Protection Agency, *NEIC Civil Investigation Report*, Joint Base Pearl Harbor-Hickam Public Water System, at 4 (April 4-8, 2022) ("NEIC Report"), available at https://www.epa.gov/system/files/documents/2022-08/NEICVP1463E01%20Joint%20Base%20Pearl%20Harbor%20Hickam%20Public%20Water%20System_Redacted.pdf [last visited Mar. 31, 2023]; *see* April 2022 Supplemental Report at 25.

[46] April 2022 Supplemental Report at 25-26.

[47] NEIC Report at 4; *see* April 2022 Supplemental Report at 29.

[48] NEIC Report at 4; *see* April 2022 Supplemental Report at 46. A "Hume pipe" is a concrete tube with reinforced bar, formed by pouring concrete into a formwork and axially rotating it so that it compacts using centrifugal force.

[49] *See* April 2022 Supplemental Report at 46. (explaining that the existing "hume drain" provided "a path for fuel entering the sump to then travel under the tunnel floor and into the soil and rock below"). A video of the leak is available at *Fuel Leak At The Navy's Red Hill Facility*, Youtube (Nov. 20, 2021), https://www.youtube.com/watch?v=GEGohRlLrSA&t=3s [last visited Mar. 31, 2023].

54.     On November 21, 2021, the Navy issued a media release stating that the leak came from a pipe unconnected to the Red Hill fuel tanks or main fuel pipelines, suggesting those sources were secure. It said there were "no signs or indication of any releases to the environment and the drinking water remains safe to drink."[50] For a week thereafter, responders insisted that the November spill had consisted mostly of water.[51]

55.     On November 27, 2021, a base housing manager received the first customer complaint about a chemical smell emanating from the water supply.[52] Moreover, the water reflected a sheen and was flammable.[53] By 5:00 p.m. the next day, housing managers had received 42 such complaints.[54] None of these complaints were reported to the Navy division responsible for potable water.[55]

---

[50] NEIC Report at 5.

[51] *See* April 2022 Supplemental Report at 31 ("The environmental staff were told by FLC PH responders that the spill was water that contained fuel."); *see also id.* at 35 ("From 20 November through 28 November, the JBPHH PWO's understanding was the spill was primarily water and maybe AFFF but could not recall any discussions during this period of time that touched on fuel as being a primary part of the spill.").

[52] *Id.* at 36; NEIC Report at 6.

[53] April 2022 Supplemental Report at 44.

[54] NEIC Report at 6.

[55] *Id.* ("The customer complaints were not sent to the NAVFAC Hawaii Potable Water Branch.").

56.    The next day, an order issued to halt the potable water pumps until further notice and utilize others instead.[56] A water sample was collected and smelled of fuel.[57] Later that day, the pump was fully secured and shut down.[58]

57.    On November 29, 2021, the main pump was turned on from the hours of 12:00-3:00 p.m., though no one knows why.[59]  At around 3:30 p.m., a Navy official called the operator to explain the pump should be off.[60]

58.    On December 2, 2021, testing in the Red Hill shaft resulted in a maximum reading of 110 parts per million of so-called "volatile organic compounds."[61] The next day, the Navy issued a news release stating that petroleum had been detected, but that readings were "4 to 10 times below" Hawai'i's recommended action level for drinking water.[62] On December 5, Hawai'i state officials authorized Navy divers to enter the well and visually inspect for evidence of contamination.[63] Five days later, they reported that fuel was dripping into the water tunnel.[64] On December 6, Hawai'i ordered the Navy to suspend operations at

---

[56] NEIC Report at 6.
[57] Id.
[58] Id.
[59] See id.
[60] Id.
[61] NEIC Report at 6; *see also* April 2022 Supplemental Report at 44.
[62] While the federal government operates the water systems at issue here, it is subject to the same local state requirements that other systems must follow.
[63] NEIC Report at 7.
[64] Id.

the Red Hill facility, including any and all fuel transfers.[65] It also required the Navy to take immediate steps to install drinking water treatment systems at the Red Hill facility to ensure that drinking water met applicable federal and state regulations and limit further contamination.[66]

### E.    The Government Failed to Alert the Public of the Leak or Its Risks

59.    Following both the May 2021 and November 2021 leaks, the Navy remained silent and failed to warn the public that the drinking water had been contaminated. The Navy's silence violated its duties under federal and state regulations and is particularly egregious given its prior knowledge of the dangers the facility posed.

60.    Federal law and EPA regulations required the Navy to issue a Tier 1 public notice within 24 hours of confirming the water system's contamination.[67] The notice had to be provided "in a form and manner reasonably calculated to reach all persons served. The form and manner used by the public water system are to fit the specific situation, but must be designed to reach residential, transient, and non-transient users of the system."[68]

61.    Similarly, Hawai'i law requires that public water systems have "adequate internal policies" including "[a] policy to inform customers or water

---

[65] NEIC Report at 7.
[66] Id.
[67] 42 U.S.C. §§ 300f-300j; *see* 40 C.F.R. § 141.202.
[68] 40 C.F.R. § 141.202.

users adequately about water quality as necessary . . . including any need for disinfection or alternate sources . . . ."[69]

62.    Despite these duties arising under both federal and state law, the Navy failed for 12 days to warn the public following the leak. In fact, key personnel downplayed the severity of the crisis. On November 28, 2021, for example, despite residents' calls and inconclusive samples, a press release reported there was no indication that the water was unsafe to drink.[70]

63.    A day later, and still lacking conclusive data, JBPHH's commanding officer released a statement to base housing residents announcing that "there were no immediate indications that the water was not safe, and that he and his staff were drinking the base water."[71]

64.    Only on December 2, 2021, under pressure from local and state officials, did the Navy finally announce that petroleum products had been detected.[72]

---

[69] Haw. Admin. R. § 11-20-29.5.
[70] April 2022 Supplemental Report at 36-38.
[71] *Id.* at 41.
[72] *Id.* at 45.

**F.     The Red Hill Leak Was Caused by Chronic and Pervasive Violations of Applicable Laws, Rules, Regulations and Standards**

65.     In April 2022, the federal National Enforcement Investigation Center (the "NEIC") conducted an inspection and investigation of the Red Hill water system.[73]  Among the problems NEIC identified were:

a) The system was using "rusted pump shafts, rusted pipes, and visible sheen in the infiltration tunnels."[74]

b) Most of the pumps in use were "original" to the water system, and inspectors found instances of "exposed wiring, rusting, flaking paint, leaking oil, and abandoned pumps."[75]

c) The Navy had no preventative maintenance program, meaning that maintenance occurred only on a reactive basis.[76]

d) There were no standard operating procedures for operating the system. Even in April 2022, operators and staff could not demonstrate a "general understanding" of the water system or how to explain its operation and maintenance.[77]

---

[73] *See generally* NEIC Report.
[74] *Id.* at 12-13.
[75] *Id.* at 13-14.
[76] *Id.* at 14.
[77] *Id.* at 14-15.

e) The Navy was incorrectly storing chemicals, using expired reagents, and unlabeled chemical feed lines.[78]

f) The system had numerous instances of rusting, pitting, vegetation growth, and lack of access around its water storage tanks. The Navy did not know when the tank had been last cleaned but believed it was up to a decade earlier.[79]

g) The Navy failed to issue a satisfactory public notification within 24 hours of confirming that the Red Hill facilities had become contaminated with jet fuel and other contaminants.[80]

h) The facility's emergency response plan was missing required information.[81]

i) The Navy's risk assessment review did not adequately address the system's risks.[82]

66.    The Navy's own reports demonstrated that negligence and human error caused the spill, finding:

---

[78] NEIC Report at 18.
[79] *Id.* at 18-19.
[80] *Id.* at 24-26.
[81] *Id.* at 29-31; *see also* United States Environmental Protection Agency, *Letter to Rear Admiral Stephen Barnett* (Sept. 2022), available at https://www.epa.gov/system/files/documents/2022-09/red-hill-spill-prevention-control-countermeasure-spcc-report-redacted-2022-08-16.pdf [last visited Mar.. 31, 2023].
[82] NEIC Report at 31.

a) "[T]here was no learning or assessment with regard to response efforts following the May spill. Most troubling, there were no integrated spill response training or drill events conducted with installation and other support personnel between the May and November spills. . . . [T]his thwarted any opportunity for human performance improvement, assessment and feedback that would have allowed for the enhancement of team performance. . . ."[83]

b) "The Environmental team [] missed critical opportunities for early validation of the water crisis," including at least one November 24 positive test for naphthalene.[84]

c) "[T]he failure to fully account for fuel spilled on 6 May (human error) [was] the primary cause of the November spill."[85]

67.     The conclusions are unmistakable. The Navy's negligence caused the May 2021 spill, then it was negligent in cleaning it up. Then, the Navy was again negligent in causing the November 2021 spill. And again, it was negligent in cleaning it up.

---

[83] April 2022 Supplemental Report at 75-76.
[84] *Id.* at 86.
[85] *Id.* at 88.

### G.    The Aftermath of the Red Hill Leak

68.    The impact of the Red Hill disaster has been felt throughout Oʻahu. In the spill's early days, residents ingested highly toxic chemicals as the Navy remained silent. After the spill, the Navy's modest efforts at remediation and "assistance" have only compounded Plaintiffs' injuries and frustration. Their lives may never be the same.

69.    Eventually, Navy officials announced their plans to flush clean water through its distribution system to clear the residual petroleum contaminants from the water supply.[86] The process, estimated to take four to ten days, would require the Navy to "flush[] . . . not just the water distribution main, *but of every home.*"[87] The Navy *hoped* this could be accomplished by Christmas 2021, but the deadline came and went as if it never existed.[88]

---

[86] The Guardian, *Hundreds of Military Families Sickened by Contaminated Pearl Harbor Water* (Dec. 3, 2021), https://www.theguardian.com/us-news/2021/dec/03/hawaii-drinking-water-contamination-navy [last visited Mar.. 31, 2023].

[87] Alaa Ellasar and Raja Razek, *Honolulu Shut Down Its Largest Water Source In Oahu Due to Reported Contamination of Navy Well Near Pearl Harbor*, CNN (Dec. 5, 2021), https://www.cnn.com/2021/12/05/us/honolulu-halawa-shaft-water-source-contamination-navy-well-oahu/index.html [last visited Mar.. 31, 2023] ("CNN, *Honolulu Shut Down*").

[88] Chelsea Yee, *Hawaiʻi Families Impacted by Navy's Water Contamination May Have to Switch Hotels, Pay Out of Pocket*, Khon2 (Jan, 4, 2021), https://www.khon2.com/local-news/hawaii-families-impacted-by-navys-water-contamination-may-have-to-switch-hotels-pay-out-of-pocket/ [last visited Mar.. 31, 2023].

70.    The spill necessitated the displacement and relocation of hundreds,

then thousands, of families. By December 5, 2021, the Navy had relocated more

than 700 people to nearby hotels.[89] But relocation was provided only to active-duty

service members and civilian employees living in base housing. Only a few days

later, the number of relocated families reached more than 3,000, but those affected

who were not in the military were left to fend for themselves.[90]

71.    Residents who were not active-duty service members or civilian

employees received no relocation assistance. These residents were forced to choose

between living in homes with dangerous, contaminated water or paying out-of-

pocket costs for relocation.

**V      THE NAVY DEPRIVED ALL AFFECTED RESIDENTS
        OF THE USE AND ENJOYMENT OF THEIR HOMES.
        ALL RESIDENTS LOST THE SAFETY AND SECURITY
        OF A HOME FREE FROM DANGEROUS CHEMICALS
        IN THE WATER SUPPLY. CLASS ALLEGATIONS**

72.    Plaintiffs bring this action on behalf of themselves and all other

persons similarly situated (hereinafter referred to as "the Class").

---

[89] See CNN, Honolulu Shut Down.

[90] Commander, United States Pacific Fleet, *Some JBPHH CNIC-Housing Registered Personnel to be Assigned to New Accommodations* (Dec. 14, 2021), https://www.cpf.navy.mil/Newsroom/News/Article/2873725/some-jbphh-cnic-housing-registered-personnel-to-be-assigned-to-new-accommodatio/ [last visited Mar.. 31, 2023]; AP, *Navy Blames Hawai'i Water Contamination on Jet Fuel Spill* (Dec. 10, 2021), https://apnews.com/article/environment-Hawaii-honolulu-harbors-congress-88b598424e667b75db2a3c7682c563f8 [last visited Mar.. 31, 2023].

73.     Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> All persons not employed by the United States military,
>
> whose drinking water was supplied by the Red Hill water
>
> shaft and were therefore exposed to contaminated water
>
> as a result of using the public water supply, and who
>
> already have or will satisfy the claim exhaustion
>
> requirements of the FTCA.

74.     Excluded from the Class is Defendant, any agents and employees of any Defendant, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family. Further excluded from the Class are any individuals that have filed separate lawsuits based on the same or similar claims as alleged in this Complaint.

75.     Plaintiffs do not know the exact number of members in the Class, but reasonably believe that the size of the Class numbers in the thousands.

76.     Defendant has harmed Plaintiffs and all members of the Class by exposing them to chemicals that significantly increase the risk of life-threatening diseases and other health-related difficulties.

77.     The joinder of all Class members is impracticable due to the size of the Class and relatively small value of each individual claim. The disposition of the

30

claims in a class action will provide substantial benefit to the parties and the Court by avoiding a multiplicity of identical suits. The Class can be identified through expert analysis and government records.

78.    There are well defined, nearly identical, questions of law and fact affecting all parties. The questions of law and fact involving the class claims predominate over questions which may affect individual Class members. Those common questions of law and fact include, but are not limited to, the following:

    a)  whether the United States was responsible for releasing jet fuel and other contaminants into Plaintiffs' drinking water;

    b)  whether the United States breached its duty when handling jet fuel and other contaminants;

    c)  whether the United States breached its duty to warn Plaintiffs about the contamination in a reasonable manner;

    d)  whether Plaintiffs and Class members have suffered from increased medical dangers, now and in the future, as a result of exposure;

    e)  whether the United States' conduct was knowing and/or willful, regarding both the release of jet fuel and other contaminants into the environment and the negative health effects thereof; and

    f)  whether the United States should provide medical monitoring relief on a going-forward basis.

79.     Because the jet fuel spill has equally increased the risk of harm to each Class member, Plaintiffs assert claims typical of each Class member. Plaintiffs will fairly and adequately represent and protect the interests of the Class and have no interests which are antagonistic to any Class member.

80.     Plaintiffs have retained counsel experienced in handling complex and class action claims.

81.     A class action is the superior method for the fair and efficient adjudication of this controversy. Class wide relief is essential to ensure that all exposed individuals recover their damages and have access to appropriate and necessary medical care. The interest of Class members in individually controlling the prosecution of separate claims is small.

82.     The United States acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with respect to the Class appropriate.

## VI     MEDICAL MONITORING

83.     The materials to which Plaintiffs have been exposed cause debilitating and serious illnesses, as described herein.

84.     Plaintiffs and others who have had significant exposure to these dangerous conditions had, have, and/or will have a substantially increased risk of contracting one or more of the ill effects described herein.

85.     Plaintiffs' exposure makes it reasonably necessary for them to undergo periodic diagnostic medical examinations different from those that would be prescribed in the absence of exposure.

86.     Monitoring procedures including, but not limited to, blood tests, skill evaluations, scans, urine tests, and physical examinations are well-established and readily available.

87.     These measures are essential to preventing and/or mitigating any long-term health consequences for which Defendant bears fault through its actions, inactions, and omissions.

88.     The necessary tests, procedures, scans, and examinations vary from normally recommended medical care because they are specifically tailored to assess and monitor the conditions Defendant has created. None of these medical precautions would be necessary in the absence of Defendant's unlawful conduct.

89.     Further, these tests, procedures, scans, and examinations would and should occur more frequently than the normal recommended schedule of examinations for a population living under the conditions Defendant created through its unlawful actions.

90.     The required tests, procedures, scans, and examinations are reasonably necessary and in accord with current medical and scientific procedures.

91.     Plaintiffs have no other adequate remedy at law and medical monitoring through the establishment of a medical monitoring fund is reasonably necessary. Further, they are financially unable to afford the increased medical monitoring they will require because of Defendant's actions.

## VII     CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## FEDERAL TORT CLAIMS ACT – NEGLIGENCE

92.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

93.     The United States owns and operates the Red Hill facility.

94.     The United States had a duty to exercise reasonable care in operating and maintaining the Red Hill facility.

95.     The United States breached its duty to exercise ordinary care at Red Hill in multiple ways:

   a)  Red Hill operators failed to operate the system properly in May 2021;

   b)  The United States failed to implement corrective actions after the May 2021 leak;

   c)  Red Hill operators failed to properly operate the train cart on the day of the November 20, 2021 leak;

    d)  officers did not properly investigate the May 2021 fuel leak and

         otherwise should have known about the fuel buildup in the fire

         suppression line; and

    e)  officers knew that maintenance failures had compromised Red Hill

         and failed to take corrective action to prevent harm.

96.    As a direct and proximate result of Defendant's breach of duty of care, Plaintiffs have been injured in the manner alleged herein.

97.    As a direct and proximate result of Defendant's negligence, Plaintiffs suffered injuries and damages in the manner alleged herein.

98.    As a direct and proximate result of Defendant's negligence, Plaintiffs will require medical monitoring in a manner to be established through discovery and trial.

99.    Plaintiffs are entitled to actual and consequential damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

## FEDERAL TORT CLAIMS ACT – NUISANCE

100.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

101.   At all relevant times, Plaintiffs owned and/or occupied property in and about the base and had a right to occupy, enjoy, and/or use their property without interference by Defendant.

102.   Defendant has created a condition that is harmful to health, offensive to the senses, and/or interferes with the comfortable enjoyment of life and property by causing the discharge of jet fuel and other contaminants into Plaintiffs' water supply—injuring both persons and homes in the affected communities.

103.   The conditions Defendant created—the release of jet fuel and other contaminants into the water supply causing injury to Plaintiffs' persons and property—are such that would reasonably annoy and disturb an ordinary person.

104.   Defendant's creation of the nuisance was negligent and  unreasonable throughout its operation of the Red Hill facility.

105.   Plaintiffs did not consent to Defendant's conduct.

106.   Defendant's actions have substantially interfered with Plaintiffs' use and enjoyment of their land, including substantial injury to Plaintiffs' persons and property by exposing them to ingestion of jet fuel and other contaminants.

107.   Defendant's actions directly and proximately caused Plaintiffs' injuries, including injuries to Plaintiffs' persons and property, diminution in the fair market value of property, impairment of the salability of property, and

36

exposure to harmful conditions that would not exist but for Defendant's wrongful acts.

108.   The seriousness of the harm Defendant has caused outweighs any social utility because Plaintiffs suffered the alleged harm without any mitigating benefit whatsoever.

109.   Defendant's conduct was a substantial factor in causing Plaintiffs' harm because Plaintiffs' property and persons have been—and continue to be—invaded and injured by exposure to toxic chemicals as a direct result of Defendant's negligence and/or recklessness.

110.   Plaintiffs are entitled to actual and consequential damages in an amount to be determined at trial.

111.   In maintaining this continuing nuisance, Defendant acts with full knowledge of the resulting consequences, and its acts and omission have been done with malice, fraud, and/or oppression.

## VIII    **PRAYER**

WHEREFORE, Plaintiffs pray for judgment against the Defendants as follows:

1.    for actual and compensatory damages, in an amount to be determined at trial;

2.     for pre- and post-judgment interest, expenses, attorneys' fees, and

costs as permitted by law; and

3.     for such other and further relief as this Court deems just and proper.

DATED: Honolulu, Hawaiʻi, April 11, 2023.

*/s/ Margery S. Bronster*
MARGERY S. BRONSTER
ROBERT M. HATCH
RICHARD D. MCCUNE[*]
DAVID C. WRIGHT[*]
DANA R. VOGEL[*]
KEENA PATEL[*]

Counsel for Plaintiffs
[*] *Pro Hac Vice Application to be submitted*

38